UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOANNA MARIE HUNT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:15-cv-1128 JAR |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. §§ 405(g) for judicial review of the Commissioner of Social Security's final decision denying Joanna Marie Hunt's ("Hunt") application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*.

**I. Background**

On July 13, 2012, Hunt protectively filed her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*., alleging disability beginning on June 25, 2012. (Tr. 262-63) The Social Security Administration ("SSA") denied Hunt's claim on September 6, 2012. (Tr. 190-94) She filed a timely request for a hearing before an administrative law judge ("ALJ") on October 25, 2012. (Tr. 199-200) Following a hearing held on October 21, 2013, the ALJ issued a written decision on November 20, 2013, upholding the denial of benefits. (Tr. 11-25) Hunt requested review of the ALJ's decision by the Appeals Council. (Tr. 7) On May 20, 2015, the Appeals Council denied her request for review. (Tr. 1-6) Thus, the decision of the Appeals Council stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

Hunt filed this appeal on July 22, 2015. (Doc. No. 1) The Commissioner filed an answer on September 28, 2015. (Doc. No. 9) Hunt filed a Brief in Support of her Complaint. (Doc. No. 11) The Commissioner filed a Brief in Support of the Answer. (Doc. No. 12) Hunt filed a Reply Brief. (Doc. No. 13)

## I.     Administrative Decisions

### A.  Decision of the ALJ

The ALJ determined that Hunt meets the insured status requirements of the Social Security Act through December 31, 2017, and has not engaged in substantial gainful activity since June 25, 2012, the alleged onset date. (Tr. 15)

The ALJ found Hunt has the severe impairments of affective disorder not otherwise specified (NOS), anxiety disorder NOS, and obsessive-compulsive disorder, but that no impairment or combination of impairments meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17) The ALJ further found Hunt's additional medical impairments of cardiac impairment, seizure disorder, sleep apnea, and restless leg syndrome, were nonsevere impairments. (Tr. 15-16)

After considering the entire record, the ALJ determined Hunt has the residual functional capacity ("RFC") to perform light work except that she can never climb ladders, rope or scaffolding. She can climb ramps or stairs up to one story at a time. She should avoid working with dangerous machinery or at unprotected heights. In addition, she can perform simple tasks and tolerate superficial contact with the general public. (Tr. 19) The ALJ found Hunt unable to perform any past relevant work, but that jobs exist in significant numbers in the national economy that she can perform, such as cleaner/housekeeper, marking clerk, and small products

assembler. (Tr. 23-24) Thus, the ALJ found that a finding of "not disabled" was appropriate. (Tr. 25)

### III. Administrative Record

The following is a summary of the relevant evidence before the ALJ.

#### A. Hearing Testimony

The ALJ held a hearing in this matter on October 21, 2013, and heard testimony from Hunt and Roni Lenore, a vocational expert. (Tr. 30-73)

##### 1. Hunt's testimony

Hunt was 36 years old at the time of hearing and living with her boyfriend and her fifteen year old twin sons. (Tr. 34-35) She last worked in June 2012 as a certified nursing assistant (CNA), staff coordinator and activities director at Elder Care of Mid-Missouri. It was Hunt's testimony that she was out on a doctor's note that said she couldn't work. (Tr. 41, 45) In 2008 she worked as CNA staff coordinator at Lifecare Centers of America. (Tr. 42-44) In 2004 she managed a fast food restaurant called Taco Time. (Tr. 43) She also worked some part-time jobs at Walmart and Denny's. (Tr. 43-44)

Hunt testified that she was unable to work primarily due to her psychological symptoms, impairments and limitations. Specifically, she reported suffering from post-traumatic stress disorder (PTSD) with severe emotional reactions, i.e., crying, shaking, etc., two to three times a week. (Tr. 46) These reactions are caused by fear of other people, and particularly her abusive ex-husband. (Id.) Hunt has been diagnosed with bipolar disorder which affects her interactions with other people. She experiences symptoms of manic behavior, poor sleep, and poor concentration. She goes into a manic stage two to three times a week. When she is in one of the depressive stages of her bipolar disorder, she sleeps all of the time. (Tr. 48-49) She neglects her

personal hygiene when she finds herself in a depressive state. (Tr. 61) Hunt also testified about the symptoms she experiences with obsessive-compulsive disorder, sleep apnea, fainting spells, hand tremors and lingering tightness in her chest following an alleged heart attack. (Tr. 49-57)

Hunt's family assists her with household chores because she drops things and can't concentrate to finish a task. (Tr. 57-58) She is able to cook on a daily basis; however, it sometimes takes her an extra half hour or longer because she forgets about cooking things. (Tr. 60-61) Hunt testified she has difficulty leaving her house or traveling alone due to her fears and psychological symptoms. (Tr. 59-60)

### 2. Testimony of Vocational Expert

Vocational expert Roni Lenore characterized Hunt's past work as nurse assistant, Dictionary of Occupational Titles ("DOT") No. 355.674-014, medium, semiskilled, with a specific vocational preparation ("SVP") of 4, performed as heavy. This job was also performed as part of a composite, which also included recreational therapist, DOT No. 074.124-014, light, skilled with an SVP of 6; personnel scheduler, DOT No. 215.367-014, sedentary, semiskilled, with an SVP of 4; and personnel clerk, DOT No. 209.362-026, sedentary, semiskilled, with an SVP of 4. (Tr. 68) Hunt's past work also included fast food worker, DOT No. 311.472-010, light, unskilled, with an SVP of 2; and manager trainee, fast food services, DOT No. 189.167-018, light, skilled, with an SVP of 6. (Id.) Lastly, Lenore characterized Hunt's work as a storage laborer, DOT No. 922.687-058, as medium, unskilled, with an SVP of 2; and waiter/waitress, informal, DOT No. 311.477-030, as light, semiskilled, with an SVP of 3. (Tr. 69)

For the first hypothetical, the ALJ asked Lenore to assume an individual of the same age, educational background and vocational history as Hunt who has no exertional limitations and can climb ramps or stairs of up to one story; never climb ladders, ropes, or scaffolds; never work at

unprotected heights or with dangerous machinery; with relatively simple tasks and superficial contact with the public. Lenore opined that such an individual could perform his/her past work as a storage laborer. (Tr. 69) In addition, there are other jobs that exist locally and nationally that such an individual could perform such as a cleaner/housekeeper, DOT No. 323.687-014, light, unskilled, with an SVP of 2, with approximately 292,600 such jobs nationally and 5,200 locally; marking clerk, DOT No. 209.587-034, light, unskilled, SVP of 2, with approximately 140,700 such jobs nationally and 2,800 locally; and assembler, small products, DOT No. 739.687-030, light, unskilled, SVP of 2, with 34,400 nationally and 630 locally. (Tr. 69-70)

The second hypothetical assumed the same individual as in hypothetical one, who is limited to light work, i.e., lifting up to 20 pounds occasionally, lifting or carrying up to 10 pounds frequently, standing or walking for approximately six hours per eight-hour day and sit for approximately six hours per eight–hour day with normal breaks. (Tr. 70) In that case, the individual could perform the same jobs discussed above. (Id.)

The third hypothetical assumed the same individual with the same functional capacity as in the second hypothetical who would miss two or more days of work per month and be off-task 20 percent or more of the work day. Lenore opined that such an individual would not be able to retain any job. (Id.)

### B. Medical Records

The ALJ summarized Hunt's medical records at Tr. 15-21. Relevant medical records are discussed as part of the analysis.

### IV. Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, No. 4:10CV2184 HEA, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F. Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

**V.    Discussion**

In her appeal of the Commissioner's decision, Hunt alleges the ALJ improperly rejected the opinions of her mental health treating sources, Gale Lee, an advanced registered nurse

practitioner (ARNP), and Felicia Petty, a mental health counselor. (Doc. No. 11 at 2) Hunt also challenges the ALJ's credibility determination. (Id. at 9-13)

**Credibility**

The Court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Hunt's credibility was essential to her determination of other issues. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible."); Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) ("The ALJ must first evaluate the claimant's credibility before determining a claimant's RFC."); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002) (same).

In evaluating a claimant's credibility, the ALJ should consider the claimant's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The claimant's relevant work history and the absence of objective medical evidence to support the complaints may also be considered, and the ALJ may discount subjective complaints if there are inconsistencies in the record as a whole. Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006) (citing Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Id. (citing Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995)). The Court will uphold an ALJ's credibility findings, so long as they are adequately explained and supported. Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005).

Here, the ALJ identified a number of reasons for finding Hunt's statements concerning the intensity, persistence and limiting effects of her symptoms not credible. (Tr. 20) First, the

9

ALJ found the objective medical evidence suggested Hunt's mental impairments were not as limiting as she alleged. (Tr. 19-20) Since her alleged onset date of June 25, 2012, Hunt consistently exhibited signs of intact social and cognitive functioning, as well as alert and cooperative behavior. (Tr. 422, 531-32, 542, 549, 551, 553, 555, 557, 559, 561, 564, 632-33, 640, 646, 651)

The ALJ further found that to the extent Hunt experiences physical limitations due to her psychological impairments, her statements and hearing testimony concerning the nature of and severity of those physical limitations were inconsistent with her longitudinal evidence of record. (Tr. 21) For example, she testified at the hearing that she continued to experience chest tightness and shortness of breath approximately twice a week (Tr. 56-57); however, she consistently denied having chest pain or shortness of breath when seen by her treating or consulting physicians. (Tr. 555, 557, 559, 561, 563, 570-71, 578-79, 616, 618, 620) Hunt also complained of seizure activity, or "drop episodes" (Tr. 54, 59), although the ALJ noted that Hunt gave inconsistent reports as to the frequency of these episodes, or "attacks." (Tr. 21)

The absence of an objective medical basis to support the degree of subjective complaints is an important factor in evaluating the credibility of the claimant's testimony and complaints. Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991). See also Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (lack of objective medical evidence is a factor an ALJ may consider).

In May 2013, Hunt reported that her PTSD symptoms had improved following a recent relocation. She also reported that her mood swings were controlled by medication and that her last manic episode had been four months prior. (Tr. 524-54) In August 2013, Hunt reported that her medication was helpful. (Tr. 645) "If an impairment can be controlled by treatment or

medication, it cannot be considered disabling." Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (quoting Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004)).

Hunt argues that the ALJ's decision ignores the variability between symptoms of depression and/or mania on the one hand, and periods of comparatively "normal" functioning on the other. She contends the Commissioner selectively relied on records of office visits which showed her to be functioning relatively well without discussing other appointments where she exhibited significant symptoms of depression, mania, and OCD symptoms. (Doc. No. 11 at 8-9; Doc. No. 13 at 1-2) To the contrary, the ALJ specifically acknowledged Hunt's ongoing psychological treatment and psychiatric medication during much of the relevant period; however, the ALJ also observed that these impairments had not objectively worsened and may have actually improved based on Hunt's statements to her treating sources. (Tr. 19-21)

The lack of objective medical evidence was just one of several factors the ALJ considered in assessing Hunt's credibility and determining her RFC. The ALJ also noted that Hunt's treatment records indicated she had been able to work in the past at semi-skilled jobs despite her history of obsessive behaviors and PTSD symptoms. (Tr. 22-23) The ability to maintain employment with an impairment, together with the absence of evidence that the condition has significantly deteriorated, tends to prove the impairment was not disabling. See Goff, 421 F.3d at 792 (the fact that claimant worked with impairments for over three years after her strokes without significant deterioration demonstrated her impairments were not disabling in the present.). See also Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

With regard to Hunt's activities, the ALJ found they were also inconsistent with the alleged severity of her symptoms and limitations. (Tr. 21) Hunt prepared meals for herself and her children on a daily basis and was able to perform several hours of household chores per day.

11

(Tr. 21, 303-04) She did not report any physical limitations. (Tr. 303-13) In May 2013, Hunt reported that she was leaving her home six or seven times a week to exercise. (Tr. 21, 531) She testified she was still driving a car despite her seizures, anxiety symptoms and lack of concentration. (Tr. 58-59) She met her boyfriend during a New Year's Eve party in 2011 and they were living together at the time of the hearing. (Tr. 34-35, 62) Hunt reported trying to get a gym membership, attending AA meetings, and taking Zumba classes for exercise. (Tr. 631) In October 2013, she reported that she volunteered at her church, including serving meals to the homeless. (Tr. 636)

The ALJ concluded that these activities indicated that Hunt could maintain concentration and attention on unskilled tasks and tolerate some level of routine social exposure, inconsistent with her testimony. (Tr. 21-22) Her activities also indicate that she can persist at light work despite her alleged physical symptoms and limitations. (Tr. 22) An ALJ may view "[a]cts which are inconsistent with a claimant's assertion of disability" to "reflect negatively upon that claimant's credibility." Chaney v. Colvin, 812 F.3d 672, 677 (8th Cir. 2016) (quoting Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)). See also Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).

The ALJ further found Hunt's receipt of unemployment benefits in the third and fourth quarters of 2012 inconsistent with her application for disability. (Tr. 22, 269-70) Hunt testified she was looking for employment while receiving unemployment benefits and interviewed for employment during this time. (Tr. 37-39) "A claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold [her]self out as available, willing and able to work." Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991)

(citation omitted)); Mo. Rev. Stat. § 288.040. See also Milam v. Colvin, 794 F.3d 978, 984 (8th Cir. 2015).

Hunt challenges the ALJ's finding as contrary to Agency policy. (Doc. No. 11 at 11-13) She cites to memoranda from the Chief ALJ, the most recent dated August 9, 2010, that state that "receipt of unemployment benefits does not preclude the receipt of Social Security disability benefits." See Chief ALJ Memorandum, No. 10-1528 (August 9, 2010). The Memorandum further states:

> The receipt of unemployment benefits is only one of many factors that must be considered in determining whether the claimant is disabled. See 20 C.F.R. § 404.1512(b) and § 416.912(b) …
>
> In addition, it is often uncertain whether we will find a person who applies for unemployment benefits ultimately to be disabled under our rules, and our decisionmaking process can be quite lengthy. Therefore, it is SSA's position that individuals need not choose between applying for unemployment insurance and Social Security disability benefits …
>
> However, application for unemployment benefits is evidence that the ALJ must consider together with all of the medical and other evidence. Often, the underlying circumstances will be of greater relevance than the mere application for and receipt of the benefits. For instance, the fact that a person has, during his or her alleged period of disability, sought employment at jobs with physical demands in excess of the person's alleged limitations would be a relevant factor than an ALJ should take into account, particularly if the ALJ inquired about an explanation for this apparent inconsistency.
>
> Accordingly, ALJs should look at the totality of the circumstances in determining the significance of the application for unemployment benefits and related efforts to obtain employment...

Id.

The Chief ALJ memorandum cited by Hunt does not preclude consideration of the receipt of unemployment benefits in assessing a claimant's credibility, but rather reaffirms Agency policy that receipt of such benefits is one of many factors an ALJ may consider. Headley v. Colvin, No. 13-CV-02989-WYD, 2015 WL 1525561, at *7 (D. Colo. Mar. 31, 2015). Moreover, the ALJ considered other factors when weighing Hunt's credibility, including her ability to work

in the past despite her psychological impairments, her daily activities, and the medical evidence. Therefore, the Court finds the ALJ did not err in considering Hunt's application for unemployment benefits in giving her testimony diminished weight. See Milam, 794 F.3d at 984-85; Smith v. Colvin, 756 F.3d 621, 625 (8th Cir. 2014); Jernigan, 948 F.2d at 1074.

In sum, the Court finds the ALJ considered Hunt's subjective complaints on the basis of the entire record and set out a number of inconsistencies that detracted from her credibility. Because the ALJ's determination not to credit Hunt's subjective complaints is supported by good reasons and substantial evidence, the Court defers to her determination. Cobb v. Colvin, 2014 WL 6845850, at *14 (E.D. Mo. Dec. 3, 2014) (internal citations omitted). See also Polaski, 739 F.2d at 1322.

**Medical opinion evidence**

In response to Hunt's allegation that the ALJ improperly rejected the opinions of her mental health treating sources, the Commissioner contends that neither Lee nor Petty are acceptable medical sources capable of establishing "a medically determinable impairment." See 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources."); SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A. 2006) ("[O]nly 'acceptable medical sources' can give us medical opinions.").[1] (Doc. No. 12 at 10-12) Regardless, "[i]n determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." See Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) (citing 20 C.F.R. § 416.927(d)(4)).

---

[1] The regulations define acceptable medical sources as licensed physicians (medical or osteopathic doctors), psychologists, optometrists, podiatrists, and speech-language pathologists. See 20 C.F.R. § 404.1513(a).

**Raphael Smith, Psy.D.**

In August 2012, the State agency psychological consultant, Raphael Smith, opined that while Hunt may have difficulty with understanding and remembering more detailed instructions and working in close contact with others due to her affective and anxiety disorders, with continued medication compliance, she retains the ability to understand and remember simple instructions with adequate concentration, persistence and pace for less demanding work. (Tr. 185) Dr. Smith further opined that Hunt could perform such tasks in an environment that did not require close or frequent interpersonal contacts. (Tr. 182, 185) The ALJ gave significant weight to Dr. Smith's opinions because they were the most consistent with Hunt's reported activities[2] and psychological examination findings since her alleged onset date. (Tr. 22) Based on the evidence of record, the ALJ incorporated Dr. Smith's opinion by finding Hunt can perform simple tasks and tolerate superficial contact with the general public. (Id.)

**Gale Lee, ARNP**

In September 2013, Hunt's psychiatric nurse practitioner Gale Lee opined that Hunt suffered from a depressive syndrome characterized by appetite disturbance, sleep disturbance, decreased energy, feelings of worthlessness, difficulty concentrating or thinking, and paranoia. (Tr. 608) He described Hunt's manic syndrome as characterized by hyperactivity, flight of ideas, decreased need to sleep, and easy distractibility (Tr. 608-09), and her bipolar disorder as being attended by autonomic hyperactivity, apprehensive expectation, and vigilance and scanning (Tr. 609). Lee noted Hunt's irrational fears, recurrent obsessions and compulsions, and recollections of a traumatic experience as a source of marked distress. (Id.) Lee opined that Hunt had marked restrictions of activities of daily living; extreme difficulties in maintaining social functioning;

---

[2] The ALJ noted that Hunt's reported activities actually indicated a greater degree of social functioning than opined by Dr. Smith (Tr. 22), a factor the ALJ considered in assessing Hunt's credibility, discussed above.

marked difficulties in maintaining concentration, persistence or pace; and a marked to extreme level of episodes of decompensation. (Tr. 610)

**Felicia Petty, Clinician**

Also in September 2013, Hunt's mental health counselor, Felicia Petty, confirmed Hunt's symptoms of depression, manic syndrome, generalized anxiety and PTSD symptoms as described by Lee. (Tr. 612-13) Petty opined that Hunt had marked restrictions of activities of daily living; extreme difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence or pace; and a marked level of episodes of decompensation. (Tr. 614)

In her decision, the ALJ listed several reasons for giving the opinions of Lee and Petty "minimal weight." First, they both relied solely on Hunt's self-reported symptoms, which, as discussed in detail above, the ALJ found were of limited credibility. (Tr. 22-23) An ALJ may properly consider that opinion evidence merits less weight when the opinion is based largely on the claimant's own subjective complaints instead of objective medical evidence. Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007). This is particularly appropriate when the ALJ has also concluded that the claimant's allegations regarding her symptoms are not credible for other reasons discussed in the decision. See Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014) ("Cline's lack of 'credibility regarding both the severity of her impairments and the limitations that they impose' also undermine Dr. Allen's statement, which expressly relied on Cline's subjective complaints of pain and discomfort.").

Next, the ALJ found that the "benign psychological findings" documented in Lee and Petty's treatment records were inconsistent with their findings of psychological disability as well as with Hunt's reported activities. (Tr. 23) For example, Hunt came to Petty for counseling on

16

May 15, 2013. (Tr. 553) At that time, Petty noted that Hunt had an organized thought process, clear motor activity and speech and cooperative behavior. (Id.) On May 23, 2013, Petty noted Hunt's mood and affect were within normal range, her thought process and orientation was organized, her motor activity and speech were clear, her behavior and functioning were cooperative. (Tr. 551) In July 2013, Petty noted Hunt had a stable mood and affect, organized thought process and orientation, clear motor activity and speech, and cooperative behavior and functioning. (Tr. 549) According to Petty, in August 2013, Hunt exhibited a depressed mood, organized thought process and orientation, clear motor activity and speech, and cooperative behavior and functioning. (Tr. 651) During an October 2013 counseling appointment, Hunt reported volunteering at her church serving meals to the homeless. (Tr. 636) Petty noted Hunt's mood and affect appeared stable, her thought process and orientation was organized, her motor activity and speech were within the normal range, and her behavior and functioning was cooperative (Tr. 635).

In June 2013, Hunt reported to Lee that she was happy and less depressed since her boyfriend had moved to Washington, where she was living at the time, and that her anxiety was decreasing. (Tr. 531) Lee noted Hunt's speech was unremarkable and that she exhibited organized thought process with a congruent affect and neutral mood. (Tr. 532) Lee also noted that Hunt demonstrated fair to good judgment and insight, as well as good concentration, and that he had no concerns with Hunt's thought content. (Id.) In August 2013, Hunt reported that her medication was helpful. (Tr. 645) During appointments in August and September 2013, Lee observed Hunt's general appearance to be unremarkable, her behavior and activity level "pleasant," her speech unremarkable, her thought form organized and intact, her attention and

17

concentration good, and her judgment and insight fair to good. (Tr. 640, 646) No concerns with Hunt's thought content were noted. (Tr. 640)

Lee saw Hunt in October 2013, a few weeks before the administrative hearing. (Tr. 631-34) Hunt told him she was trying to get a membership at the YMCA, and that she walked and took a "Zumba" class for exercise. (Tr. 631) Hunt also stated she went to Alcoholics Anonymous meetings. (Tr. 631) Lee observed that Hunt had "organized/intact" thought forms, with fair to good judgment and insight, and good concentration. (Tr. 632) It was Lee's assessment that Hunt's situation had improved in that she was less depressed, was getting a little more sleep, and seemed less overwhelmed. (Tr. 633)

Inconsistency with the medical evidence as a whole and with claimant's admitted activities and abilities is a proper reason for discrediting a medical source opinion. See Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010); Ponder v. Colvin, 770 F.3d 1190, 1196 (8th Cir. 2014). Upon review of the record, the Court concludes the ALJ properly evaluated Lee and Petty's opinions, listing "good reasons" for giving them no weight. Prosch, 201 F.3d at 1013. The Court finds, therefore, that the ALJ's decision to discount Lee and Petty's opinions and give significant weight to Dr. Smith's opinion is supported by substantial evidence on the record as a whole.

Hunt seems to suggest the ALJ did not adequately develop the record because she did not arrange for an additional examination, enlist a review by a medical expert, or re-contact the medical experts to have them review the entire record. (See Doc. No. 11 at 14) Although a claimant's RFC is a medical question (as opposed to a vocational question) and must be supported by some medical evidence, an ALJ is not limited to considering medical evidence exclusively. An ALJ must determine a claimant's RFC "based on all of the relevant evidence,

including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ is required to order medical examinations and tests only if the medical records do not provide sufficient medical evidence to determine whether the claimant is disabled. Johnson v. Astrue, 627 F.3d 316, 320 (8th Cir. 2010); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); 20 C.F.R. § 1519a(a). As discussed herein, the ALJ thoroughly reviewed the medical evidence of record and made factual findings regarding this evidence. (Tr. 19-23) There is no indication the ALJ felt unable to make the assessment she did. Tellez, 403 F.3d at 957.

**VI. Conclusion**

For these reasons, the Court finds there is substantial evidence in the record as a whole to support the denial of benefits and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate Judgment will accompany this Order.

Dated this 28th day of September, 2016.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**